[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11298
Non-Argument Calendar

_____

D.C. Docket No. 0:15-cr-60180-WPD-2


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MIGUEL ABREAU-PENA,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 19, 2017)

Before ED CARNES, Chief Judge, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Miguel Abreau-Pena was convicted by a jury of conspiring to distribute

heroin, possessing with the intent to distribute heroin, and using or carrying a firearm during or possessing a firearm in furtherance of a drug trafficking offense. He contends that the district court erred by admitting certain evidence against him, that the instructions given to the jury were erroneous, and that the evidence submitted at trial was insufficient to support his convictions.

## I.

At trial Detective Frank Canales of the Broward County Sheriff's Office testified that he was involved as an undercover officer in the investigation and arrest of Abreau-Pena.[1]  Before the events leading to Abreau-Pena's conviction, operating undercover Detective Canales had participated in several drug transactions with Abreau-Pena's cousin, Antonio Rivera-Valencia.  In particular, he had bought five kilograms of methamphetamine from Rivera-Valencia as part of an earlier controlled buy.  Even though that buy led to three arrests, Detective Canales was able to convince Rivera-Valencia that he had nothing to do with them.

In July 2013 Rivera-Valencia contacted Detective Canales and informed him that five kilograms of heroin was available for purchase in Atlanta and asked if he wanted to buy it for $240,000.  That price included the cost of transporting the heroin to Detective Canales in South Florida.  The drugs were to be delivered by a

---

[1] "Because [Abreau-Pena was convicted by a jury and] the district court denied [his] motion for a judgment of acquittal, we recount the facts of this case in the light most favorable to the government and draw all reasonable inferences in favor of the jury's verdict."  See United States v. Martin, 803 F.3d 581, 585 (11th Cir. 2015).

courier hired by the drug trafficking organization Rivera-Valencia was a part of. Detective Canales agreed to the arrangement and price.

On July 22, Rivera-Valencia called Detective Canales to inform him that the drugs would be delivered the following day. Early the next morning, Detective Canales met Rivera-Valencia at his hotel before driving to a Starbucks to consummate the deal. But Rivera-Valencia's couriers were delayed and the buy had to be rescheduled for later that morning.

While they waited on the couriers, Detective Canales told Rivera-Valencia that, when the couriers arrived, they would all proceed to a warehouse. Detective Canales told him it was a business, but it was really an undercover sting location. Rivera-Valencia said that the driver of the couriers' vehicle would be handling the next drug transaction on his own. Detective Canales dropped Rivera-Valencia off at his hotel to wait until the couriers arrived.

The couriers finally made it to Lauderhill around ten that morning. Detective Canales picked up Rivera-Valencia and they headed back to the Starbucks. The couriers were waiting there in a Honda Accord. Detective Canales, Rivera-Valencia, and the couriers then drove four miles down the road to the warehouse. At some point during the trip from Rivera-Valencia's hotel to the warehouse, he commented on the violence of Mexican drug cartels, saying that if you steal from them they would hurt or kill you and he referred to the fate of one

3

thief in particular.

When they arrived, the couriers pulled their vehicle into the warehouse and Detective Canales closed the bay door behind them.  There were four individuals in the courier's Honda:  Abreau-Pena (who was the driver), Antonio Rodriguez-Adame, Abreau-Pena's brother-in-law, and a three-year old child.  Once the Honda was safely ensconced in the warehouse the couriers exited their vehicle.

Detective Canales and Rivera-Valencia went into an office space and waited for the three couriers to join them.  According to the detective, they did so because it would have been "disrespectful" to watch the couriers remove the heroin from the secret compartment in the Honda where it was stashed.

But the warehouse was monitored by audio and video recording equipment. So Detective Canales later learned that the drugs had been stored in a secret compartment in the rear seat of the Honda.  According to Detective Kevin Loughran, opening that compartment required someone in the front seat to operate controls that would allow the secret compartment to open.  Detective Canales testified that, in this instance, Abreau-Pena operated the controls from the front seat, and Rodriguez-Adame collected the heroin.

Abreau-Pena checked a gun that he had stored in his waistband as if to make sure it was readily accessible.  Abreau-Pena and Rodriguez-Adame then walked towards the office to join Detective Canales and Rivera-Valencia.  Just before

4

entering the office, Abreau-Pena checked his gun again.

In the office, Rodriguez-Adame gave the heroin to Detective Canales in a pillowcase.  There were four packages in the pillocase, which the parties stipulated contained a total of 4,022 grams of heroin.  Detective Canales removed the heroin from the pillowcase and placed it on the table.  He inspected one of the packages and confirmed it contained heroin.  While he did so, Rodriguez-Adame told the detective that he was the owner of the heroin, that he only came along this time to "get comfortable" with Detective Canales, and that he would be sending Abreau-Pena alone the next time.

After he inspected the package, Detective Canales said that he needed get the money to pay for the drugs and left the office.  That was the signal to other officers who were waiting nearby.  Rivera-Valencia, Rodriguez-Adame, and Abreau-Pena were arrested.  A firearm was found in Abreau-Pena's waistband at the time of his arrest.

Abreau-Pena was indicted for (1) conspiracy to possess with intent to distribute one kilogram or more of heroin, (2) possession with intent to distribute one kilogram or more of heroin, and (3) using or carrying a firearm during and in relation to or possessing a firearm in furtherance of a drug trafficking offense.  A jury found him guilty on all three counts.  This is his appeal.

## II.

Abreau-Pena contends that (1) the Federal Rules of Evidence required the district court to exclude certain evidence, (2) the district court failed to properly instruct the jury as to the weapons, and (3) the evidence presented at trial was insufficient to support his convictions.  We address each argument in turn.

## A.

Abreau-Pena argues that the district court erred by admitting (1) Detective Canales' testimony concerning the initial phone call he had with Rivera-Valencia setting up the drug deal, (2) Detective Canales' testimony explaining how he knew Rivera-Valencia, (3) a recording and transcript of Rivera-Valencia's comments about Mexican cartels hurting or killing those who stole from them, and (4) Detective Canales' testimony about Rivera-Valencia's comments.  He argues that this evidence was inadmissible under Rule 404(b) of the Federal Rules of Evidence.

We review only for an abuse of discretion a district court's evidentiary rulings.  United States v. Deverso, 518 F.3d 1250, 1254 (11th Cir. 2008).  "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." Hartford Cas. Ins. Co. v. Crum & Forster Specialty Ins. Co., 828 F.3d 1331, 1333 (11th Cir. 2016) (quotation marks omitted).

6

Rule 404(b) provides:  "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  That said, "[e]vidence of criminal activity other than the charged offense is admissible for purposes of Rule 404(b) if it [ ] pertain[s] to the chain of events explaining the context, motive and set-up of the crime [and is] linked in time and circumstances with the charged crime, or forms an integral and natural part of the account of the crime, or is necessary to complete the story of the crime for the jury."  United States v. Lehder-Rivas, 955 F.2d 1510, 1515–16 (11th Cir. 1992) (quoting United States v. Van Dorn, 925 F.2d 1331, 1338 (11th Cir. 1991)) (second and third alteration in original) (formatting adjusted).

Detective Canales' testimony describing his phone call with Rivera-Valencia and explaining their prior relationship is clearly "linked in time and circumstances" with Abreau-Pena's offense.  Id.  A jury would naturally wonder how this deal was arranged and how Rivera-Valencia came to call Detective Canales.  Those details are "necessary to complete the story of the crime for the jury."  Id.  And we do not think that any unfair prejudice resulted from their admission.  The district court did not abuse its discretion by allowing that testimony.

As for Rivera-Valencia's comments about the violent tendencies of Mexican drug cartels and Detective Canales' explanation about those comments, they too

form part of the context of the conspiracy. And even if the district court did err by admitting the comments, "[a]n erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless." United States v. Azmat, 805 F.3d 1018, 1041 (11th Cir. 2015) (quotation marks omitted). "[A]n evidentiary error is harmless if it had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." Knight v. Thompson, 797 F.3d 934, 942 (11th Cir. 2015) (quotation marks omitted).

We are convinced that, to the extent the district court erred by admitting the comments about the cartel, the error was harmless. There is nothing in the record before us to indicate that the comments explicitly associated Abreau-Pena or any of the other conspirators with cartel violence, except to the extent that the conspirators were connected to the cartels. There is also no indication that the comments described in detail any violence. And the testimony about them was brief. In light of the overwhelming evidence of Abreau-Pena's guilt in this case, the brief mention of an earlier incident of cartel violence did not substantially prejudice Abreau-Pena.[2]

## B.

Abreau-Pena next contends that that the district court erred in instructing the jury as to the firearms charge. The district court told the jury:

---

[2] Because we conclude that any error in admitting the cartel comments was harmless, we need not address Abreau-Pena's argument that they were more prejudicial than probative.

8

The defendant can be found guilty of [using or carrying a firearm during or possessing a firearm in furtherance of a drug trafficking crime] only if [the government] proved beyond a reasonable doubt [that] during and in relation to [the charged] drug trafficking crimes, the defendant knowingly used or carried a firearm . . . or that the defendant knowingly possessed a firearm in furtherance of either of those drug trafficking crimes . . . .

To "use a firearm" means more than a mere possession and more than proximity and accessibility to the firearm.  It requires active employment of the firearm as by brandishing or by displaying it in some fashion.

To "carry a firearm" is to have the firearm on one's person in order to transport the firearm, such as in a vehicle, from one place to another while committing the drug trafficking crime.

To use or carry a firearm "in relation to a crime" means that the firearm had some purpose or effect with respect to the crime, and it was not there by accident or coincidence.  The firearm must have facilitated or had the potential of facilitating the crime.

To "possess a firearm" is to have direct physical control of the firearm or have knowledge of the firearm's presence and the ability and intent to later exercise control over the firearm.

"Possessing a firearm in furtherance of a crime" means that the firearm helped, promoted, or advanced the crime in some way.

At trial, Abreau-Pena asked the district court to add the following language to that charge to clarify the role the firearm had to play in the drug offense:

In other words the firearm must serve some important function or purpose of criminal activity.

The nexus between the gun and the drug operation can be established by the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to the drugs or drug profits, and the time and circumstances under which the gun is found.

(Quotation marks omitted.)  The district court declined to give those additional

9

instructions.

We review for an abuse of discretion a district court's decision not to give a requested jury instruction. Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1309 (11th Cir. 2013). "In refusing to give a requested jury instruction, [a]n abuse of discretion is committed only when (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC, 684 F.3d 1211, 1224 (11th Cir. 2012) (quotation marks omitted) (alteration in original).

Abreau-Pena was not prejudiced by the district court's failure to give his requested instruction. The instructions the court did give conveyed the gist of what Abreau-Pena's instruction would have told the jury. The court instructed the jury that "possession in furtherance of a crime" required that the firearm help, promote, or advance the crime. And it told the jury that using or carrying a firearm "in relation to a crime" required more than a showing that the firearm was there by "accident or coincidence": it required a showing that the firearm facilitated or had the potential to facilitate the crime. All Abreau-Pena's proposed instruction would have added was a statement that the firearm's function must have been "important" and examples of the ways in which the nexus between the firearm and the crime could be proved. In light of the fact that "[t]he district court has broad discretion in

10

formulating a jury charge as long as the charge as a whole is a correct statement of law," we cannot say that it was an abuse of discretion for the district court to use its wording instead of the wording Abreau-Pena suggested. United States v. Schlei, 122 F.3d 944, 969 (11th Cir. 1997) (quotation marks omitted).

C.

Finally, Abreau-Pena contends that the government failed to present sufficient evidence to support his convictions. We review de novo a challenge to the sufficiency of the evidence. United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011). "In so doing, [we view] the evidence in the light most favorable to the Government and resolve[ ] all reasonable inferences and credibility evaluations in favor of the verdict." United States v. Isnadin, 742 F.3d 1278, 1303 (11th Cir. 2014). "We must affirm [Abreau-Pena's] convictions unless, under no reasonable construction of the evidence, could the jury have found [him] guilty beyond a reasonable doubt." See United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005).

"To sustain a conviction for conspiracy to possess [heroin] with intent to distribute, the government must prove beyond a reasonable doubt (1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." See United States v. Lopez-Ramirez, 68 F.3d 438, 440 (11th Cir. 1995). A reasonable jury could find that the government

met that burden in this case.  Detective Canales' testimony established that several people were working together to deliver heroin from Atlanta to Florida.  Abreau-Pena arrived at the appointed time in the appointed place.  He arrived armed.  He operated the controls to open the compartment where the cocaine was hidden.  And two of his co-conspirators told Detective Canales that Abreau-Pena would be handling future drug transactions on his own.  That evidence is sufficient to show that a conspiracy existed, that Abreau-Pena knew it existed, and that he voluntarily joined it.

Likewise, the government submitted sufficient evidence for a reasonable jury to conclude that Abreau-Pena possessed heroin with the intent to distribute it. "To convict [Abreau-Pena] of possession with intent to distribute [heroin], the government had to establish three elements:  (1) knowledge; (2) possession; and (3) intent to distribute."  See United States v. Mercer, 541 F.3d 1070, 1076 (11th Cir. 2008).  Here, a jury could infer from Abreau-Pena's arrival at the drug transaction, the fact that he was the driver of the Honda, the fact that he came armed, the fact that he operated the controls to the compartment, and the fact that he came into the office where the deal was consummated, that he knew the heroin was in the vehicle and intended to participate in its distribution.  The evidence that he drove the vehicle and operated the compartment controls is sufficient to show that he "possessed" the heroin.  See United States v. Battle, 892 F.2d 992, 999

12

(11th Cir. 1990) ("Possession may be either actual or constructive; if the accused exercised some measure of dominion or control over the contraband, either exclusively or in association with others, he constructively possessed it.") (quotation marks omitted).

And there was sufficient evidence to sustain Abreau-Pena's conviction for using or carrying a firearm during and in relation to or possessing a firearm in furtherance of a drug trafficking offense. He had a gun in his waistband during the course of a drug transaction involving more than four thousand grams of heroin. It is indisputable that Abreau-Pena was carrying a firearm during a drug trafficking offense. The only question is whether he did so "in relation to" that offense. The Supreme Court has explained that "the phrase 'in relation to' is expansive" and requires only a showing that the "gun at least must facilitat[e], or ha[ve] the potential of facilitating, the drug trafficking offense." Smith v. United States, 508 U.S. 223, 237–38, 113 S. Ct. 2050, 2058–59 (1993) (alterations in original) (quotation marks omitted). A jury could reasonably find that to be the case here. Abreau-Pena brought the firearm with him to the office and checked it twice on his way there from the car. The jury could infer that he had the firearm for protection, facilitating the drug transaction by giving him a means of defending himself if the deal went bad. That is enough to show that he carried the weapon "in relation to" the drug trafficking offense. See Smith, 508 U.S. at 238, 113 S. Ct. at 2059

13

(explaining that "[in] the ordinary case under § 924(c)(1) . . . the gun . . . facilitates the offense by providing a means of protection or intimidation") (alteration in original) (quotation marks omitted).

III.

In sum, the district court did not abuse its discretion in admitting evidence of Detective Canales' prior contact with a co-defendant's cousin.  The admission of a discussion of Mexican cartels hurting or "taking out" those who had stolen from them was, at most, harmless error.  Declining to give the precise jury instruction that Abreau-Pena requested was not an abuse of discretion.  And sufficient evidence supported all of Abreau-Pena's convictions.

**AFFIRMED.**